Filed 6/8/22  P. v. Leonard CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C090650 |
| v. | (Super. Ct. No. 17FE020029) |
| THOMAS FREDERICK LEONARD, | |
| Defendant and Appellant. | |

A jury convicted defendant Thomas Frederick Leonard on 11 counts of lewd and lascivious acts upon six-year-old A., and one count of sexual penetration of A. The trial court sentenced defendant to a determinate term of 26 years and an indeterminate term of 15 years to life in prison.

Defendant now contends (1) that although there was sufficient evidence he touched A.'s genitals with the requisite intent, there was insufficient evidence he did so more than once; (2) the trial court should have allowed evidence that A. previously accused her cousin of sexually molesting her; (3) the trial court should not have allowed a psychologist's testimony that false allegations of child sexual abuse were infrequent; (4) A.'s trial testimony, and the admission of her out-of-court statements, violated defendant's constitutional right to confrontation because he was unable to adequately cross-examine her; (5) defendant's trial counsel was ineffective in failing to object to prosecutorial arguments that played on the jury's sympathies and disparaged defendant

1

and his trial counsel; (6) cumulative error requires reversal; and (7) the trial court erred in not staying punishment on count one pursuant to Penal Code section 654[1] because counts one and five were based on the same act.

We conclude (1) substantial evidence supports the jury's finding of two lewd or lascivious acts involving defendant's fingers or hand touching A.'s genitalia; (2) the trial court did not abuse its discretion in excluding the prior-accusation evidence; (3) the error in admitting Dr. Washington's testimony that children very infrequently lie about sexual abuse was harmless; (4) defendant's right to confrontation was not violated; (5) defendant fails to establish that any deficient representation unduly prejudiced him; (6) defendant's cumulative error claim is without merit; and (7) the trial court should have stayed the sentence on count one or five under section 654.

We will affirm the judgment of conviction but reverse the sentence and remand the matter to the trial court with directions to resentence defendant and stay the sentence on count one or count five under section 654.

BACKGROUND

A. had an auditory processing disorder and was diagnosed with atypical autism on the spectrum. She lived with her mother Taylor, Taylor's boyfriend, defendant, and defendant's wife Tammie.[2] Defendant was a father figure to Taylor, and A. called defendant grandpa.

On September 16, 2016, six-year-old A. told Taylor that defendant pulled A.'s pants down. A. appeared scared. Taylor did not continue the conversation because defendant kept walking by her bedroom door, throwing things and slamming doors. She took A. to the park the next day. There, A. disclosed that defendant had her watch

---

[1] Undesignated statutory references are to the Penal Code.

[2] We will refer to certain individuals by their first names for clarity.

"illegal videos," had sex with her, put his mouth on her privates, put his penis in her mouth and had her touch his penis.

Taylor took A. to UC Davis Medical Center the next morning, where A. was interviewed by a social worker and Sacramento County Sheriff's Deputy Tim Mullin. A. told the UC Davis Medical Center social worker that someone touched A.'s vagina and kissed A. on the lips. A. told Deputy Mullin that defendant showed A. videos with naked adults and children touching each other on the computer, and defendant lifted A.'s shirt up and touched her chest, pulled down her underwear, touched her vagina, sucked on her front private area, put his finger in her anus and put his penis in her mouth, vagina and anus.

A social worker working in conjunction with law enforcement officers interviewed A. during what was called a SAFE interview two days later. A recording of that interview was played at the trial. A. told the SAFE interviewer that defendant made her watch "illegal videos" that had sex in it with adults and kids, made her touch his privates, touched her butt, and kissed her on the lips with his tongue in her mouth. She said defendant also kissed her privates under her shirt, put his penis in her vagina and butt, and made her suck his penis.

Dr. Angela Vickers conducted a nonacute evidentiary exam on A. on September 20, 2016. The exam yielded no abnormal findings. Dr. Vickers testified it was common to have a normal exam in young children who disclosed sexual abuse because the tissues around the genitals heal very quickly. She said an adult penis could penetrate a seven-year-old's anus and not cause injury.

Taylor recorded a conversation with A., using a cassette recorder law enforcement officers had given Taylor to record pretext calls with defendant. The prosecutor played the recorded conversation between Taylor and A. at the trial. A. told Taylor that defendant sucked A.'s privates, A. sucked defendant's privates, defendant put his "carrot private" in A.'s mouth, and defendant put A.'s private in his private and kissed A. like an

3

adult. She also said defendant sucked her nipples. She said she and defendant started to do sex 10 times after Tammie went to bed. When asked what they did, A. said "private, butt and nipples" and "mouth, mouth tongue nipples privates and butt."

The prosecutor also played recordings of pretext calls by Taylor to defendant. Defendant told Taylor that A. called defendant her fiancé and said she and defendant were going to have sex and A. got mad when defendant told her no. Defendant claimed A. "got pissed off at [defendant], and fabricated something . . . ." He said he caught A. watching a video of a woman giving oral sex to a man and A. thought she was going to do that to defendant but she never had. He said he did not tell Taylor a lot of things because he was afraid Taylor would beat A. and he did not believe in spanking so he tried to correct A.'s conduct himself. He described various "inappropriate gestures" by A. He said A. crawled into his bed with only her underwear on and grabbed his privates when he was asleep. A. tried to grab his privates another time. He said A. had seen his penis two or three times. About a month and a half to two months prior, A. grabbed his hand and shoved his finger in her vagina when he was sitting on the couch watching television. He said A. grabbed his hand and put it in her vagina probably half a dozen times. He told Taylor that A. pulled her pants down and shoved her butt into him and he lied to Taylor and Tammie about what happened. Defendant denied that he pulled A.'s pants down, touched A. with his penis, put his fingers in her anus, or that A. gave him oral sex.

Sheriff's deputies searched defendant's apartment about two weeks after the pretext calls. Pornographic videos, some featuring younger-looking females, were found in defendant's bedroom. Forensic examination of defendant's computer showed internet searches for "seven-year-old girl wants sex with grandpa" and "young girl's hand job." There were also searches for cartoon hand job, "very young girls give head," and "10-year-old hand job." Sexually explicit images found on defendant's computer included an anime depicting a female who could be under the age of 18. No child pornography was found.

4

Defendant's wife Tammie told Sergeant Kimberly Mojica that she caught A. wiggling her butt on defendant's crotch, with her pants and underwear down. Tammie said she confronted defendant about it but defendant did not say much. Tammie also reported seeing the following: A. rubbing her naked chest on defendant while he sat in a chair, A. grabbing defendant's penis, and A. grabbing defendant's hand and shoving it into her vagina when defendant was on the bed. Tammie claimed A. was trying to "manhandle" defendant and break up her marriage. Tammie also claimed that Taylor owed $150 on a utility bill and defendant kicked Taylor and A. out. At trial, Taylor denied there was an argument about money prior to A.'s disclosure or that she was told to move out.

Sergeant Mojica interviewed defendant the day after the search. The prosecutor played a recording of that interview for the jury. Defendant told Sergeant Mojica that defendant was the victim. Defendant said A. was infatuated with and sexually attracted to him. He said she was good at storytelling and made up a story to get back at him. Also, Taylor left after he told her he needed her to help with a $500 utility bill. Defendant said A. "started doing all these gestures" in 2015. She called him her fiancé and said they were going to have sex. She kissed him on the lips. She tried to put her face down toward his penis, with her mouth open, a couple of times but he moved away. She looked at pornography sites on Taylor's cell phone, and she saw Taylor performing oral sex. He caught A. watching videos depicting oral sex in August 2016. His fingers were inside A. only once, in August 2016, when A. took his hand and shoved his fingers in her privates when he was on the couch watching television with her. In the first week of September, A. pulled his pants down twice when he was in the kitchen and grabbed his penis. On about September 11 or 12, A. got into his bed wearing only her underwear and grabbed his privates when he was asleep. A. stood between his legs, dropped her pants and wiggled her butt into his privates three times. He tried to discipline A. on his own because Taylor beat A. and he feared for A.

5

A. testified at trial when she was nine years old. She said defendant showed her videos with naked boys and girls. She did not look up the videos herself. Defendant kissed her on the lips once and it made her feel weird. Defendant touched her butt with his penis, put his penis in her mouth and touched her vagina with his fingers. A. denied that she told lies about defendant.

A number of witnesses, including Tammie, defendant's daughters Luarra and Sarrah, stepdaughter Nelta, and an individual named Jocelyn, testified that they never saw any sexually inappropriate conduct by defendant toward A. Defense witnesses testified about A.'s inappropriate conduct toward defendant and other men. Tammie said A. called defendant her husband all the time and said she and defendant were going to have sex. Tammie told the jury she saw A. grab defendant's hand and put his hand toward A.'s privates. And she saw A. try to give defendant oral sex when he was asleep. Tammie also saw A. jump off defendant's lap and pull her pants up after Tammie heard defendant say, "[A.], what are you doing? Get off me."

Defendant's daughter Elezebeth testified that A. was "attention seeking" and had "boundary issues." According to Elezebeth, A. tried to be sexual with defendant. A. tried to give defendant a prolonged kiss and got angry when he stopped her. A. called defendant and other males her boyfriend. She talked about wanting to have a boyfriend so she could have sex. She wore heels and her top like a bikini and said she was trying to get a boyfriend.

Nelta testified that A. was hypersexual. Nelta saw A. "hump" the couch or a chair. According to Nelta, A. frequently used her hands to squish her own breasts, pointed them at others and shook them. Sarrah testified that A. was very clingy with defendant and called him her boyfriend and fiancé. A. borrowed Sarrah's cell phone to play a game once, but Sarrah caught A. watching pornography on it. Sarrah's boyfriend Max also testified that A. looked up pornography on his cell phone. He said A. tried to kiss him on the lips once and he told her it was inappropriate and stopped her. She also

6

tried to touch Max on his thigh and he stopped her. Luarra's boyfriend Zachary testified that A. referred to him as her boyfriend a lot and tried to sit close to him on the couch, making him uncomfortable. A. also tried to kiss him on the cheek, but he stopped her. A witness named Kristin likewise recounted that A. was "very touchy" and rubbed her husband's arm and tried to sit on his lap. Several defense witnesses testified that they saw A. twerk.

Defense witnesses criticized Taylor. Kristin testified that Taylor had a detailed conversation about masturbation and blow jobs in front of A. Sarrah confirmed she and Taylor discussed what semen tasted like in A.'s presence. Jocelyn testified that Taylor made out with her boyfriend in front of A. and used "sexual language" around A. many times. Max likewise testified that Taylor made out with her boyfriend in front of A. According to Tammie, Taylor performed oral sex on her boyfriend in the living room while A. was asleep on the couch. Tammie said she talked to Taylor three or four times about A.'s sexualized behavior and Taylor did nothing. Other defense witnesses testified similarly.

Defendant also presented evidence regarding the use of his computer. Tammie and Elezebeth testified that many people used defendant's computer. But defense witnesses denied searching topics such as 10-year-old hand jobs or cartoon blow jobs.

The jury found defendant not guilty on count six (fingers in A.'s genitalia in the kitchen -- § 288, subd. (a)), but convicted defendant on 11 counts of lewd and lascivious acts upon a child under the age of 14 years with the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of defendant or the child, along with one count of sexual penetration of a child who is 10 years of age or younger (counts one through five and seven through thirteen -- §§ 288, subd. (a), 288.7, subd. (b)). The trial court sentenced defendant to a determinate term of 26 years and an indeterminate term of 15 years to life in prison.

7

Additional background facts are included in the discussion as relevant to contentions on appeal.

DISCUSSION

I

Defendant contends that although there was sufficient evidence that he touched A.'s genitals with his hand with the intent of sexual gratification, there was insufficient evidence that he did so more than once; therefore, the conviction on count one or count two must be reversed.

In determining whether sufficient evidence supports a conviction, " 'we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . . "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We do not reweigh evidence. (*Ibid.*) " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) The effect of this standard of review is that a defendant challenging the sufficiency of the evidence to support his or her conviction bears a heavy burden on appeal. (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1287.)

Defendant was charged in counts one and two with violating section 288, subdivision (a) (lewd or lascivious act upon a child under the age of 14 years). Count one alleged that around July 2016, defendant willfully put his fingers to A.'s genitalia when he was on the couch. Count two alleged that between January 1, 2016, and September 30, 2016, defendant willfully put his hand to A.'s genitalia when they were at the apartment.

The elements of a section 288, subdivision (a) offense include the following: (1) the willful commission of a lewd or lascivious act, that is, an act that is lustful, immoral, seductive or degrading; (2) upon or with the body, or any part thereof, of a child under 14 years of age; (3) with the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of the defendant or the child. (§ 288, subd. (a); *People v. Memro* (1985) 38 Cal.3d 658, 697, overruled on another ground by *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.)

A. testified that defendant touched her vagina with his fingers but she did not state how many times defendant had done so. Nevertheless, defendant admitted during a pretext call that his fingers or hand touched A.'s vagina probably half a dozen times. Defendant described an incident about a month and a half before the September 23, 2016 pretext call when he was on the couch watching television with A. and A. shoved his finger in her vagina. He described another incident when he was half asleep with A. cuddled up to him in the bed and A. grabbed his hand and "shoved me in there." He also said about a month before the September 23, 2016 pretext call, he and A. were playing when all of a sudden A. put his hand in between her legs and started moving.

There was other evidence of defendant touching A.'s vagina. During his interview with Sergeant Mojica defendant repeated his pretext call admission that his fingers were in A.'s privates during an incident on the couch. Dr. Christopher Fisher testified that defendant told the doctor that defendant's fingers or hand touched A.'s vagina more than once. Nelta testified she was aware that defendant stuck his fingers in A.'s vagina more

9

than once. Elezebeth testified defendant told her that A. tried to masturbate herself with his hand when the two were sitting on the couch. And consistent with defendant's pretext call admission, Tammie reported to Sergeant Mojica and testified at trial that when defendant and A. were on defendant's bed, A. grabbed defendant's hand and shoved it in A.'s vagina or towards A.'s privates. The above is substantial evidence from which the jury could find beyond a reasonable doubt at least two lewd or lascivious acts involving defendant's fingers or hand touching A.'s genitalia.

## II

Defendant next contends the trial court erred in excluding evidence that A. previously accused her cousin of sexually molesting her.

## A

The People moved in limine to exclude evidence that A. previously accused her cousin of touching her inappropriately. The circumstances of the prior complaint were as follows: A. and her cousin were alone in the bathroom for about five minutes before Taylor knocked on the locked door and the children came out. The cousin was 10 years old at the time of the incident. A. told Taylor that the cousin touched her with his private. The cousin denied the accusation. Taylor reported the incident to Child Protective Services in 2015. According to defendant's trial counsel, following an investigation, Child Protective Services concluded that the accusation was unsubstantiated or unfounded. A copy of the Child Protective Services' report is not in the record. The People objected to the prior-accusation evidence as irrelevant and as hearsay unless the cousin was called as a witness.

Defendant's trial counsel said she did not intend to offer the prior-accusation evidence "unless the door was opened." She said the prior accusation would be relevant if A. claimed she never made an allegation of sexual abuse before she disclosed the sexual abuse by defendant. The trial court concluded it did not need to rule on the People's motion because defendant did not seek to admit the prior-accusation evidence.

10

It also determined, based on counsel's representations, that the prior-accusation evidence was not relevant.

The issue of A.'s prior accusation was later raised in the context of defendant's motion to admit evidence of A.'s sexual conduct. Defendant's trial counsel said Nelta would testify that A. accused the cousin of touching A. Defendant's trial counsel conceded that only A. and the cousin knew what happened and there were two versions of what happened. The trial court ruled, based on the offer of proof, that the prior-accusation evidence was irrelevant and inadmissible under Evidence Code section 352.

Luarra subsequently testified on cross-examination that she wrote a letter stating defendant was falsely accused. She admitted, however, that she had concluded defendant was innocent without knowing any of the facts in the case. Defendant's trial counsel moved to admit the prior-accusation evidence, arguing that the prosecutor's questions eliciting Luarra's admission were misleading. Defendant's trial counsel argued Luarra believed A.'s accusation against defendant was false in part because A. had previously accused someone of sexual abuse, and the prosecutor's question about Luarra's letter opened the door to admit the prior-accusation evidence. The prosecutor countered that the prior-accusation evidence would require recalling Taylor and calling percipient witnesses, and the evidence was irrelevant to whether a 67-year-old man would put his penis inside a little girl's mouth.

The trial court denied defendant's motion, concluding that the prior-accusation evidence was irrelevant. The trial court also excluded the evidence under Evidence Code section 352 because it was potentially confusing and admission of the evidence would be unduly time-consuming.

B

Defendant sought to admit the prior-accusation evidence to rehabilitate Luarra. "Where the attempt has been made to discredit a witness . . . , the party who called the witness is allowed, subject to certain limitations, to 'rehabilitate' the witness, i.e., to

11

restore his or her credibility, by rebutting the discrediting evidence, or by introducing evidence favorable to credibility." (3 Witkin, Cal. Evid. (5th ed. 2012) Presentation at Trial, § 371.) However, as defendant concedes, the value of the prior-accusation evidence to rehabilitate Luarra or to impeach A. depended on proof that A.'s charge against the cousin was false. (See *People v. Winbush* (2017) 2 Cal.5th 402, 469 (*Winbush*); *People v. Miranda* (2011) 199 Cal.App.4th 1403, 1424.) A trial court has discretion under Evidence Code section 352 to exclude evidence of prior reports of molestation "if proof of the falsity of the prior complaint 'would consume considerable time, and divert the attention of the jury from the case at hand.' " (*Miranda, supra*, 199 Cal.App.4th at p. 1424.) We review a trial court's ruling regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. (*People v. Jones* (2017) 3 Cal.5th 583, 609.)

To establish that the prior-accusation evidence was relevant, defendant would have had to establish that A.'s claim that the cousin touched her inappropriately was false. (See *Winbush, supra*, 2 Cal.5th at p. 469.) The People disputed that the prior accusation was false. Defendant's offer of proof was that Child Protective Services found A.'s charge against the cousin was unsubstantiated or unfounded. "Unfounded" means it was determined by an investigator that a complaint was (i) false; (ii) inherently improbable; (iii) involved an accidental injury; or (iv) did not constitute child abuse or neglect under section 11165.6. (§ 11165.12, subd. (a).) "Substantiated" means it was determined by an investigator that the complaint constituted child abuse or neglect under section 11165.6 based on evidence that made it more likely than not that child abuse or neglect occurred. (§ 11165.12, subd. (b).) Defendant did not proffer evidence establishing that A.'s report against the cousin was false. On appeal, defendant asserts that it appears from the record that the cousin did not molest A., but defendant fails to provide a record citation for the factual assertion.

12

The record indicates the inquiry into whether A.'s prior accusation was false could have involved calling the Child Protective Services investigator, Taylor, A., and the cousin. The cousin was about 11 years old at the time of the trial and was described as having developmental delays or emotional issues. The defense had not interviewed the boy and there was no proffer of testimony by A. and her cousin. The trial court reasonably concluded, under the circumstances before it, that any probative value of the prior-accusation evidence was substantially outweighed by the probability that its admission would necessitate undue consumption of time or create a substantial danger of confusing the issues. Defendant fails to demonstrate an abuse of discretion by the trial court.

We also reject defendant's contention that the trial court's ruling deprived him of his constitutional rights to present a defense and cross-examine adverse witnesses. "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834; accord *People v. Gurule* (2002) 28 Cal.4th 557, 620.) And "notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.) As we have explained, the trial court did not err in excluding the prior-accusation evidence under Evidence Code section 352. Further, defendant had ample opportunity to present evidence attacking A.'s credibility.

### III

Defendant also argues the trial court should not have allowed Dr. Washington's testimony that false allegations of child sexual abuse were infrequent, and if the issue is forfeited by his trial counsel's failure to object, his trial counsel rendered ineffective assistance.

A

Psychologist Dr. Anna Washington testified about Child Sexual Abuse Accommodation Syndrome (CSAAS).  In responding to a question about suggestibility, she said it would be difficult to make a child agree that someone sexually abused the child if that did not actually happen.  But she agreed that children can lie.  When asked about literature on false reports of sexual abuse by children, Dr. Washington said children very infrequently lie about sexual abuse, and research showed that false allegations tended to be made by someone other than the child and tended to be more common when there was a lot of conflict, such as during a custody battle.  There was no objection from defendant's trial counsel to the questions and answers regarding false allegations, and no motion to strike.

Defendant's trial counsel asked during cross-examination whether Dr. Washington could know whether a child reporting abuse was coached.  The doctor responded that research on false allegations suggested it was very infrequent for children to make things up.  Defendant's trial counsel did not object to, or move to strike, Dr. Washington's response.

B

Defendant failed to preserve his challenge to Dr. Washington's testimony because he did not object to, or move to strike, that evidence in the trial court on the grounds he raises on appeal.  (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 81.)  We address the claim on the merits, however, because defendant contends his trial counsel rendered ineffective assistance by failing to object to, or move to strike, the testimony.

While expert testimony on CSAAS is admissible when relevant for the limited purpose of evaluating the credibility of an alleged child sexual abuse victim, an expert witness may not opine that it is rare or very infrequent for children to make false allegations of sexual abuse.  (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 170-172, 174-180; *Lopez v. State* (2009) 288 S.W.3d 148, 156; *Lane v. State* (2008) 257 S.W.3d

14

22, 24-25, 27; *State v. Lindsey* (1986) 720 P.2d 73, 75-76.) This is because the determination of a witness's credibility is not a subject sufficiently beyond common experience that an expert's opinion would assist the trier of fact; therefore, an expert witness may not give an opinion as to whether another witness is telling the truth. (*Lapenias,* at pp. 176, 178-180.) We review the erroneous admission of expert testimony for prejudice under the *People v. Watson* (1956) 46 Cal.2d 818 harmless error test, i.e., reversal is warranted only if it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Lapenias,* at pp. 176-177; *People v. Wilson* (2019) 33 Cal.App.5th 559, 571-572 (*Wilson*).)

Dr. Washington's testimony that it was very infrequent for children to lie about sexual abuse was inadmissible. (*Lapenias, supra*, 67 Cal.App.5th at pp. 178-180.) However, the error in admitting the evidence was harmless. The improper testimony was brief. Additionally, Dr. Washington made clear that CSAAS was not intended to determine whether a particular child was sexually abused, she did not know the facts of this case, and it was not her role to opine whether defendant was guilty or not guilty. Further, defendant countered Dr. Washington's testimony with the testimony of defense expert Dr. William O'Donohue that a sizeable percentage of sexual abuse allegations by children was false. Moreover, the prosecutor did not refer to Dr. Washington's testimony about the frequency of false sexual abuse allegations by children in her closing and rebuttal statements. And defendant's recorded statements and statements to Elezebeth and Dr. Fisher corroborated A.'s reports of digital penetration and other acts of inappropriate touching. In addition, the trial court instructed the jury, pursuant to CALCRIM No. 226, on the factors the jury may consider in evaluating a witness's testimony. A. testified at the trial and the jurors could assess her credibility. The trial court instructed that the jurors alone must judge the credibility of the witnesses; in evaluating a child's testimony, the jury should consider all of the factors surrounding the child's testimony, including the child's age and level of cognitive development; and the

15

jury was not bound by an expert witness's opinion. We presume the jurors understood and followed the trial court's instructions. (*Lapenias, supra*, 67 Cal.App.5th at p. 180.) Based on the above, it is not reasonably probable that defendant would have received a more favorable result in the absence of Dr. Washington's testimony that children very infrequently lie about sexual abuse. (*Ibid.; Wilson, supra*, 33 Cal.App.5th at p. 572.)

IV

Defendant further contends that A.'s trial testimony, and the admission of A.'s out-of-court statements, violated his constitutional right to confrontation because he was unable to effectively cross-examine her, and his trial counsel was ineffective in not raising an objection. Defendant notes that it was difficult for A. to testify and that she indicated, in response to some questions, that she did not remember, she did not know, or that nothing had happened.

As defendant concedes, his trial counsel did not object to the admission of A.'s out-of-court statements and trial testimony on Confrontation Clause grounds. The failure to raise the objection in the trial court on the ground raised on appeal forfeits defendant's appellate claims. (*People v. Redd* (2010) 48 Cal.4th 691, 730 (*Redd*).) However, we will consider defendant's Confrontation Clause claim because he asserts his trial counsel was ineffective in not raising an objection. We review defendant's Confrontation Clause claim de novo. (*People v. Seijas* (2005) 36 Cal.4th 291, 304; *People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.)

"The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " (*Ohio v. Clark* (2015) 576 U.S. 237, 243 [192 L.Ed.2d 306].) The Confrontation Clause is concerned only with testimonial statements. (*Davis v. Washington* (2006) 547 U.S. 813, 821 [165 L.Ed.2d 224] (*Davis*); *People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*).) Statements are testimonial "when the circumstances objectively indicate that there is no

16

. . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis,* at p. 822; accord *People v. Sanchez* (2016) 63 Cal.4th 665, 689.) "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," (*Davis,* at p. 822) or "some other purpose unrelated to preserving facts for later use at trial." (*Sanchez,* at p. 689.) In determining the primary purpose of an interrogation or statement, we consider all of the relevant circumstances, including whether an ongoing emergency existed, the identity of the interrogator, and the formality of the situation and the interrogation. (*Ohio,* at pp. 244-245, 249.) "[T]he question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " (*Id.* at p. 245.)

Defendant contends that A.'s statements to Deputy Mullin and the SAFE interviewer, and the recorded statement to Taylor, were testimonial. We agree. (*Davis, supra*, 547 U.S. at p. 822; *People v. Sisavath* (2004) 118 Cal.App.4th 1396, 1402-1403; *U.S. v. Bordeaux* (8th Cir. 2005) 400 F.3d 548, 555-556; *State v. Blue* (N.D. 2006) 717 N.W.2d 558, 561-565; *State v. Snowden* (2005) 867 A.2d 314, 325-330 [385 Md. 64]; *State v. Mack* (Or. 2004) 101 P.3d 349, 352-353.)

There was no ongoing emergency at the time A. spoke with Deputy Mullins, the SAFE interviewer and Taylor. Unlike the 911 caller in *Davis*, A. described past events and not events as they were happening. (*Davis, supra*, 547 U.S. at p. 827.) There was no indication of an ongoing threat to A. or someone else inasmuch as the identities of the victim and the perpetrator were known and A. and Taylor had left defendant's apartment for the hospital.

In addition, A.'s statements to Deputy Mullin and the SAFE interviewer were provided in a formal setting. Deputy Mullin interviewed A. at the hospital in response to

17

a report of child sexual abuse. The purpose of his interview was to determine whether a crime had been committed. He took notes at the time of the interview and prepared a police report. The SAFE interview was conducted in a room monitored by Sergeant Heidi Hampton and was video-recorded. The social worker who conducted the interview prepared for the interview with Sergeant Hampton and a deputy district attorney and they formulated a plan for eliciting information from A. The purpose of the SAFE interview was to memorialize A.'s statement. Although not formal, A.'s recorded statement to Taylor was taken after Taylor reported A.'s disclosure of inappropriate touching to Deputy Mullins, received instructions from Sergeants Hampton and Mojica on what to do during a pretext call, and conducted a supervised pretext call to defendant. Taylor told A. she was recording their conversation so that Taylor could remember everything, and Taylor repeatedly urged A. to tell her "absolutely everything that happened." Recordings of the SAFE interview and Taylor's conversation with A. were played at the trial. The circumstances under which A. made her statements to Deputy Mullin, the SAFE interviewer, and Taylor would lead an objective witness reasonably to believe that A.'s statements were obtained to preserve facts for later use at trial. Those statements are, thus, subject to Confrontation Clause strictures.

The Confrontation Clause secures a right to " 'an adequate opportunity to cross-examine adverse witnesses' [citation], which requires that the defendant ' " '[have] an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling [the witness] to stand face to face with the jury in order that they may look at [the witness], and judge by [the witness's] demeanor upon the stand and the manner in which [the witness] gives his [or her] testimony whether [the witness] is worthy of belief.' " ' " (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 963 (*Giron-Chamul*).) Courts examining whether a defendant was denied his or her right to confrontation distinguish between an adverse witness's failure to remember and refusal to answer important questions. (*Id.* at pp. 965-966.) A witness's failure to remember,

18

whether real or feigned, does not deny the defendant an opportunity to effectively cross-examine the witness.  (*People v. Foalima* (2015) 239 Cal.App.4th 1376, 1388, 1392-1394 (*Foalima*); *People v. Perez* (2000) 82 Cal.App.4th 760, 766-767 (*Perez*).)  A witness's refusal to answer questions, on the other hand, may violate the defendant's right to confrontation.  (*Giron-Chamul,* at pp. 965-969; *People v. Murillo* (2014) 231 Cal.App.4th 448, 449-450, 454-456.)

Unlike the child witness in *Giron-Chamul*, A. did not refuse to answer cross-examination questions.  (*Giron-Chamul, supra*, 245 Cal.App.4th at p. 966.)  In response to a number of cross-examination questions, A. testified that she did not remember.  But A.'s claimed lack of memory on cross-examination did not violate defendant's right to confrontation.  (*Foalima, supra*, 239 Cal.App.4th at pp. 1388, 1392-1394; *Perez, supra*, 82 Cal.App.4th at pp. 766-767.)  The Confrontation Clause does not guarantee testimony that is not "marred by forgetfulness, confusion, or evasion.  To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.' "  (*U.S. v. Owens* (1988) 484 U.S. 554, 558 [98 L.Ed.2d 951].)

Moreover, the Confrontation Clause did not bar the admission of A.'s prior testimonial statements when she appeared at trial, was subject to unrestricted cross-examination, and the jury had an opportunity to observe her demeanor.  (*Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 [158 L.Ed.2d 177]; *Redd, supra*, 48 Cal.4th at p. 730-731; *Cage, supra*, 40 Cal.4th at p. 978, fn. 7.)

Under the circumstances, defendant's claim of ineffective assistance fails. A defendant claiming ineffective assistance of counsel must affirmatively establish that (1) his or her trial counsel's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient representation prejudiced defendant.  (*People v. Maury* (2003) 30 Cal.4th 342, 389;

19

*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

The judgment must be upheld if the defendant fails to establish either prong. (*Strickland,* at p. 687.) With regard to the second prong, defendant must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the defendant would have obtained a more favorable result. (*Maury,* at p. 389; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218; *Strickland,* at pp. 693-694.) A reasonable probability is a probability sufficient to undermine confidence in the conviction. (*Maury,* at p. 389.) It is not enough for defendant to show that errors had some conceivable effect on the outcome of the case. (*Ledesma,* at p. 217.)

Here, defendant has not established that his counsel was deficient in not objecting, because an objection would have lacked merit. Nor has defendant established that the lack of objection resulted in undue prejudice.

V

Defendant further claims his trial counsel was ineffective in failing to object to prosecutorial arguments that played on the jury's sympathies and disparaged defendant and his trial counsel.

In her closing statement, defendant's trial counsel urged that A.'s strange behavior created reasonable doubt as to the charges against defendant. Defense counsel pointed to testimony indicating that A. was preoccupied with the male anatomy, A. was exposed to discussions about sex and saw her mother having sex, A. tried to kiss men and touched them in a way that made them uncomfortable, A. called men her fiancé or boyfriend and said she was going to have sex with them, and A. looked up pornography. Counsel said the defense was not that A. was a promiscuous girl, but that A. was overly sexualized because of what she had been exposed to and children who had been exposed to sexual conduct and watched pornography were sexually curious and acted out. Defense counsel argued that A. and Taylor had lied and Taylor had coached A.

In rebuttal, the prosecutor argued that defendant lied during his interview with Sergeant Mojica so that he could "get out of it." The prosecutor said, "He thinks [Sergeant Mojica will] let him go home because he can disparage a six and seven-year-old child. . . . [¶] He disparaged this child by way of his defense. You've all probably heard of times past when a woman who is claiming rape would have people come in and testify about her unchaste ways. Come in and say she's a flousy [*sic*], she's out every night at the clubs. She has a permiscuous [*sic*] lifestyle, and therefore she could not have been raped because she dances provocatively, because she's a hugger. That's what the defense is in this case, ladies and gentlemen. And I am not attacking [defense counsel] for this. The defendant has placed her in this position. [¶] The defendant insists during his interview that this little girl has sexually assaulted him, and she can only play the cards she's dealt. She's tried admirably to convince you that this little girl is an absolute flousy [*sic*]. But ask yourself, who did [A.] accuse of sexual molestation? Was it Zack? Was it Max? Was it Jason the dead guy? It [*sic*] the only adult in her life that this little flousy [*sic*] has accused is Thomas Leonard. [¶] And so what Thomas Leonard is trying to get you to believe is that she is to blame. The only person to blame in this case, ladies and gentlemen, is the liar that sits before you charged with 13 counts of child molestation who had sexually provocative images and searches on his computer for child pornography." The prosecutor argued that the case was about what defendant did, not what A. did. The prosecutor suggested that defense counsel brought up the fact that defendant was a veteran and presented testimony disparaging A. to create bias and sympathy for defendant. The prosecutor said, "She wants to disparage this mother. She wants to disparage this victim, and she wants to build her client up to be something he is not, because she wants you to use bias and sympathy in determining that maybe he was -- maybe he was the victim here, maybe all he was trying to do was to protect [A.] and protect Taylor. Ask yourself if that's reasonable." The prosecutor encouraged the jury to look at all of the evidence, assess A.'s credibility and use reason.

The prosecutor's rebuttal statements accurately described defendant's case. In his recorded statement to Sergeant Mojica, defendant blamed A. and said he was the victim. He claimed A. was sexually attracted to him and was fantasizing, A. was very aggressive, and A. fabricated the molestation allegations to get back at him. But even if the prosecutor's rebuttal statement remarks were misconduct, and even if defendant's trial counsel had rendered ineffective assistance by not objecting to the prosecutor's statements, defendant fails to establish prejudice. A.'s testimony and out-of-court statements, defendant's recorded statements, and his internet search history are compelling evidence of his guilt. Moreover, the trial court instructed that the jury cannot let bias, sympathy or prejudice influence its decision. It instructed that the jury must decide the facts based only on the evidence presented in the trial, and closing argument remarks by the attorneys did not constitute evidence. It instructed on how to judge the credibility of witnesses. It specified the elements of the charged crimes and instructed on defendant's claim of accident. It admonished that in deciding whether the People had proved their case beyond a reasonable doubt, the jury must impartially compare and consider all the evidence received at the trial and unless the evidence proved that defendant was guilty beyond a reasonable doubt, the jury must find defendant not guilty. We presume the jury followed the trial court's instructions. (*People v. Daveggio & Michaud* (2018) 4 Cal.5th 790, 857; *People v. Edwards* (2013) 57 Cal.4th 658, 764.) On this record, it is not reasonably probable that defendant suffered prejudice from defense counsel's failure to object to the prosecutor's rebuttal argument statements. Accordingly, we reject defendant's ineffective assistance claim.

VI

Because we have rejected each of defendant's appellate claims, we likewise reject his claim that cumulative trial error requires reversal.

22

## VII

In addition, defendant argues the trial court erred in not staying punishment on count one pursuant to section 654.  He claims counts one and five were based on the same act.

Section 654 precludes multiple punishments for a single act or omission.  (*People v. Deloza* (1998) 18 Cal.4th 585, 591-592.)  Subdivision (a) of the statute provides, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."  "[A] course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.)  Moreover, in cases involving sexual offenses, section 654 does not apply even where the defendant had the same objective -- sexual gratification -- unless the crimes were incidental to or the means by which another offense was accomplished.  (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006-1007.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.  [Citations.]  Its findings will not be reversed on appeal if there is any substantial evidence to support them.  [Citations.]  We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.  [Citation.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

The jury convicted defendant of violating section 288, subdivision (a) in count one in that defendant's fingers touched A.'s genitalia on the couch around July 2016.  It convicted defendant of violating section 288.7, subdivision (b) in count five in that his fingers were in A.'s genitalia on the couch sometime between January 1, 2016 and

23

September 30, 2016. The trial court did not stay either of the sentences imposed on counts one and five pursuant to section 654, implicitly finding that counts one and five involved separate acts. Substantial evidence does not support that finding.

Count five was based on the statements during defendant's interview with Sergeant Mojica about an incident on the couch. Specifically, defendant described an incident that occurred probably in the first or middle part of August when he and A. were on the couch watching Ninja Turtles, A. had a towel or blanket over her and A. shoved defendant's fingers in her privates. Defendant described that incident to Taylor during a pretext call. He also told Taylor about an incident on the bed and an incident when he was playing with A. But defendant did not describe another incident of his hand or fingers touching or inside A.'s vagina that occurred on the couch. Because the record contains no evidence of two separate acts involving defendant's fingers touching or inside A.'s genitalia on the couch, the trial court should have stayed the sentence on count one or count five under section 654.

DISPOSITION

The judgment of conviction is affirmed. The judgment of sentence is reversed and the matter is remanded to the trial court with directions to resentence defendant and stay the sentence on count one or count five under section 654.

/S/
MAURO, Acting P. J.

We concur:

/S/
DUARTE, J.

/S/
HOCH, J.

24